IRON WORKERS LOCAL UNION NO. 17 INSURANCE FUND AND ITS TRUSTEES, et al., Plaintiffs,

v.

PHILIP MORRIS INCORPORATED, et al., Defendants.

No. 1:97–CV–1422.

United States District Court, N.D. Ohio, Eastern Division.

Nov. 23, 1998.

Eben O. McNair, Timothy Joseph Gallagher, Schwarzwald & Rock, Cleveland, OH, Jack Landskroner, Landskroner Law Firm, Cleveland, OH, John M. Broaddus, Robert J. Connerton, Connerton, Ray & Simon, Washington, DC, Michael C. Spencer, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Patrick J. Coughlin, Frank J. Janecek, Jr., Scott H. Saham, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Paul J. Pennock, Sedgwick, Detert, Moran & Arnold, New York City, Jerry Kristal, Weitz & Luxenberg, New York City, Lembhard G. Howell, Richard G. Piccioni, C. Cleveland Stockmeyer, Michael E. Withey, Paul L. Stritmatter, Philip G. Arnold, Kevin Coluccio, Keith L. Kessler, J. Murray Kleist, Stritmatter, Kessler, Whelan & Withey, Seattle, WA, George Kargianis, Kargianis, Watkins, Marler, Seattle, WA, Roger M. Adelman, Washington, DC, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, Einer R. Elhauge, Harvard Law School, Cambridge, MA, Mitchell M. Breit, Karen J. Sabine, Weitz & Luxenberg, New York City, for Local 17 Intl. Assoc. of Bridge, & Iron Workers Insurance Fund, and its Trustees, plaintiffs.

Lawrence R. Desideri, Thomas J. Frederick, Dan K. Webb, Kevin J. Narko, Bradley E. Lerman, Winston & Strawn, Chicago, IL,

Hugh E. McKay, Robert D. Anderle, Porter, Wright, Morris & Arthur, Cleveland, OH, for Philip Morris, Inc., defendant.

Roger Allen Hipp, Jones, Day, Reavis & Pogue, Cleveland, OH, Matthew A. Kairis, Jeffrey J. Jones, Melanie S. Fahey, Jones, Day, Reavis & Pogue, Columbus, OH, Daniel F. Kolb, Davis, Polk & Wardwell, New York City, for RJR Nabisco, Inc., defendant.

Phillip J. Campanella, Calfee, Halter & Griswold, Cleveland, OH, Kenneth N. Bass, Paul Taylor, Kirkland & Ellis, Washington, DC, for Brown & Williamson Tobacco Corporation, American Tobacco Company, defendants.

John Winship Read, Amanda Martinsek, Vorys, Sater, Seymour & Pease, Cleveland, OH, for British American Tobacco Co., Ltd., defendant.

Percy Squire, Lloyd Pierre–Louis, Bricker & Eckler, Columbus, OH, Thomas D. Lambros, Janik & Forbes, Cleveland, OH, Mark G. Cunha, Patrick D. Bonner, Jr., Randall Rainer, Simpson, Thacher & Bartlett, New York City, for B.A.T. Industries P.L.C., defendant.

Craig E. Gustafson, Gary R. Long, William J. Crampton, Bruce R. Tepekian, Shook, Hardy & Bacon, Kansas City, MO, Samuel R. Martillotta, Mansour, Gavin, Gerlack & Manos, Cleveland, OH, Patrick M. McLaughlin, John F. McCaffrey, McLaughlin & McCaffrey, Cleveland, OH, for Lorillard Tobacco Company, defendant.

Thomas P. Meaney, Jr., Kenneth J. Walsh, Tyler Lee Mathews, McDonald, Hopkins, Burke & Haber, Cleveland, OH, Marc E. Kasowitz, Marie V. Santacroce, Michael M. Fay, Julie R. Fischer, Marie V. Santocroce, Kasowitz, Benson, Torres & Friedman, New York City, for Liggett Group, Inc., defendant.

Steven D. Bell, Ulmer & Berne, Cleveland, OH, for United States Tabacco Sales and Marketing Company, defendant.

David J. Hooker, Thomas J. Collin, Robert Francis Ware, Jr., Thompson, Hine & Flory, Cleveland, OH, Steven Klugman, Harry Zirlin, Anne E. Cohen, Debevoise & Plimpton, New York City, for Tobacco Research U.S.A., Inc., The Counsel, defendant.

Charna E. Sherman, David J. Michalski, James M. Drozdowski, Kathleen Balthrop Havener, Hahn, Loeser & Parks, Cleveland, OH, for Tobbacco Institute, Inc., defendant.

Susan V. Belanger, Arter & Hadden, Cleveland, OH, John P. Gartland, Arter & Hadden, Columbus, OH, Michael C. Lasky, Davis & Gilbert, New York City, Hill & Knowlton, Inc., for Hill & Knowlton, Inc., defendant.

## OPINION AND ORDER

GWIN, District Judge.

On October 5, 1998, the defendants in this class action tobacco litigation filed four motions for summary judgment. With these motions, defendants first seek judgment on the argument that the statute of limitations stops certain of plaintiffs' claims [Doc. 272]. Second, the defendants ask for judgment on plaintiffs' civil conspiracy claim and as to plaintiffs' right to punitive damages [Doc. 277]. Third, the defendants solicit judgment on the argument that plaintiffs are unable to prove causation [Doc. 279]. Finally, the defendants request judgment on the argument that Plaintiff Funds did not suffer cognizable injury [Doc. 281].

### I. Summary of Motions

Defendants first ask for judgment based on the statute of limitations. With this argument, the defendants say that plaintiffs were aware of the facts leading to their claims long before they sued on May 20, 1997. In claiming plaintiffs' causes of action accrued long ago, defendants claim the facts supporting plaintiffs' claims were matters of common knowledge for decades. Defendants say the statute of limitations stops all or part of plaintiffs' claims.

Among the arguments made in their statute of limitations motion, defendants say plaintiffs may not recover for antitrust violations more than four years before they filed this action. Defendants argue that the statute of limitations for RICO also stops claims based on conduct occurring before May 20, 1993. Defendants also contend in their first motion that plaintiffs' claims for conspiracy are time-barred because the underlying actions are time-barred.

The Court first decides whether defendants are entitled to judgment on statute of

limitations grounds as to plaintiffs' action under the Ohio Corrupt Activity Act. The Ohio Corrupt Activity Act has a significantly different and much more liberal statute of limitation. After this examination, the Court finds defendants are not entitled to judgment on the plaintiffs' Ohio Corrupt Activity Act claim on statute of limitations grounds.

To decide whether the statute of limitation stop plaintiffs' other claims, the Court first determines when plaintiffs' causes of action accrued. To make this decision, the Court decides whether the discovery accrual rule or the fraudulent concealment exception applies.

The Court concludes that plaintiffs cannot successfully invoke the fraudulent concealment exception to the statute of limitations. However, after reviewing Sixth Circuit precedent on when these claims accrue, the Court finds genuine factual issues about when plaintiffs' federal RICO claim accrued. This prevents summary judgment on the federal RICO claim. The statute of limitations issues are best decided by a jury at trial. Therefore, the Court will deny the defendants' first summary judgment motion.

As to plaintiffs' antitrust claims, the Court finds that plaintiffs' cause of action accrued more than four years before they filed this action. Also, the Court finds that plaintiffs fail to show that any fraudulent concealment should toll this limitation period. Finally, the Court finds that plaintiffs fail to show that a new and independent act that is not merely a reaffirmation of previous acts within four years of the filing of this action. The Court therefore grants defendants motion for judgment as to the federal Clayton Act claim (Count IV) and the state Valentine Act claim (Count X).

In their second motion, the tobacco industry defendants argue that plaintiffs' state law civil conspiracy claim fails because the unlawful underlying acts, antitrust and RICO claims, are themselves conspiracies. Further, the defendants argue that plaintiffs cannot recover punitive damages because the acts underlying the conspiracy do not allow punitive damages. The Court grants that portion of the defendants' second motion for summary judgment on plaintiffs' request for punitive damages on their civil conspiracy claim (Count XI). However, the Court de-nies that portion of defendants' motion for summary judgment on the plaintiffs' conspiracy claim.

With their third motion for summary judgment, defendants seek judgment on the claim that the plaintiffs' are unable to prove causation. In making the claim that no material facts support plaintiffs' ability to show causation, the defendants first argue that plaintiffs do not show that the funds would have changed their operation if they had knowledge of defendants' alleged unlawful conduct. Defendants also say that plaintiffs present insufficient evidence that plaintiffs could have altered the smoking habits and medical expenses of their beneficiaries.

Also in their causation motion, defendants argue that the Plaintiff Funds cannot quantify the damage caused by any alleged wrongdoing because a statistical damage model does not purport to link the plaintiffs' claimed damages to anything the Funds did or did not do because of the defendants' alleged wrongful conduct.

Upon review of the defendants' causation motion, the Court finds that the defendants reargue much of the same ground covered in this Court's September 10, 1998 order denying defendants' motion to dismiss. In this most recent motion, the defendants again fail to convince the Court that the Court should give judgment on these grounds.

In their fourth motion for summary judgment, the defendants argue that because these Taft–Hartley Fund trusts received sufficient contributions to cover health care costs, any increased medical expenditures to treat smoking beneficiaries did not damage individual Plaintiff Funds. With this motion, defendants try to turn rudimentary economics on its head. In our free market economy, defendants suggest that costs do not matter. But of course, when costs increase, demand reduces. With any increased cost resulting from illness caused by defendant's conduct, the Plaintiff Funds must reduce benefits it otherwise affords its beneficiaries. The utility of the Plaintiff Funds changes for the worse when costs increase because of illegal conduct.

After review, the Court denies defendants' third and fourth motions for summary judgment. Both motions essentially rehash posi-

tions taken by the defendants in their earlier motion to dismiss the First Amended Complaint. No facts or legal authorities cited by defendants cause this Court to conclude the Court should stop this case on causation grounds.

Therefore, having reviewed the defendants' four requests for summary judgment, the Court grants in part and denies in part defendants's first motion for summary judgment. The Court denies the defendants' third and fourth motions. The Court grants that portion of defendants' second motion for summary judgment as to punitive damages and denies the balance.

## II. History of this Class Action Lawsuit

The plaintiffs are certain trusts organized to provide health-related benefits to workers and their families.[1] The representative plaintiffs are six jointly-administered, multi-employer health and welfare trust funds in the state of Ohio. The class consists of approximately 114 similarly-situated health and welfare trusts, all in Ohio.[2] Both the named plaintiffs and the members of the certified class are nonprofit, union-sponsored tax-exempt trusts organized under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1100.01 et seq., and the Taft–Hartley Act, 29 U.S.C. § 186(c)(5).

On May 20, 1997, Plaintiff Funds brought this action against tobacco-related entities.[3] Plaintiffs allege that since about 1953, the defendants illegally shifted the large health care costs of smoking onto plaintiffs, proposed class members, and other health care payers. Plaintiff Funds contend that the defendants expected, foresaw, and planned this shift of expenses. Plaintiffs further allege that as the direct result of the defendants' wrongdoing, plaintiffs and other similar trust funds had to make substantial expenditures to pay for treatment of smoking-related illnesses and addiction.

In their First Amended Complaint, Plaintiff Funds stated eighteen (18) counts against the defendants. To date, five (5) counts remain for adjudication.[4] In Count I of the First Amended Complaint, plaintiffs make

---

**1.** Plaintiffs are Iron Workers Local Union No. 17 Insurance Fund, IBEW Local No. 38 Health & Welfare Fund, Ohio Laborers' District Council–Ohio Contractors' Association Insurance Fund, Dealers–Unions Insurance Fund, Local 47 Welfare Fund No. 1, Toledo Electrical Welfare Fund and their trustees.

**2.** Ohio-based multi-employer trust funds, by one estimate, pay health care costs of approximately 450,000 persons. The proposed class consists of all jointly-administered, multi-employer health and welfare trusts in Ohio and their respective trustees. The trust funds serve union members in industries, such as transportation and the building trades, where a unionist might have a series of employers throughout his or her career. See Doc. 153, Affidavit of Michael E. Withey.

**3.** Defendants are Philip Morris, Inc.; RJR Nabisco, Inc.; RJR Nabisco Holdings Corp.; R.J. Reynolds Tobacco Co.; Brown & Williamson Tobacco Corp.; Lorillard Tobacco Co.; American Tobacco Co.; Liggett Group, Inc.; United States Tobacco Sales and Marketing Co., Inc.; The Council for Tobacco Research—U.S.A., Inc.; The Tobacco Institute, Inc.; Hill & Knowlton, Inc.; and British–American Tobacco Co., Ltd. ("BAT-Co.").

On September 8, 1998, plaintiffs voluntarily dismissed The Smokeless Tobacco Council, Inc. as a defendant in this case [Doc. 237]. Further, by order entered September 14, 1998, this Court

dismissed Defendant B.A.T. Industries, p.l.c. as a defendant in this case [Doc 238].

**4.** On September 8, 1998, plaintiffs voluntarily dismissed without prejudice certain claims. These include Count V (fraud), Count IX (unjust enrichment), and Count XII (violation of the Ohio Deceptive Trade Practices Act). Plaintiffs earlier withdrew Count VIII (breach of warranty), Count XIII (violation of ERISA), Count XVII (strict product liability), and Count XVIII (negligence). [See Doc. 237].

On June 22, 1998, Plaintiff Funds also voluntarily dismissed certain claims based upon the "regulatory enterprise." These claims include Count II (violation of federal RICO, 18 U.S.C. § 1962(a) and (d)); Count III (violation of federal RICO, 18 U.S.C. § 1962(b) and (d)); Count XV (violation of Ohio RICO, § 2923.32(A)(3)); and Count XVI (violation of Ohio RICO, § 2923.32(A)(2)). See Doc. 134. Further, by order dated September 10, 1998, the Court dismissed Counts VI (intentional breach of special duty) and Count VII (negligent breach of special duty) [Doc. 234].

The five remaining claims in this case are: Count I (federal RICO, 18 U.S.C. § 1962(c) and (d), except against Defendants Council for Tobacco Research, The Tobacco Institute, and Hill & Knowlton); Count IV (federal antitrust, 15 U.S.C. § 1, against all remaining defendants); Count X (state antitrust, Ohio Rev.Code § 1331 et seq., against all remaining defendants); Count XI (civil conspiracy against all remaining defen-

claim under the Federal Racketeer Influenced and Corrupt Organizations Act of 1970, also known as RICO. 18 U.S.C. § 1961 *et seq.* In Count XIV, plaintiffs make claim under the Ohio equivalent of RICO, the Ohio Pattern of Corrupt Activity Act ("Ohio Corrupt Activity Act"), Ohio Rev.Code §§ 2923.31 *et seq.* In Counts IV (federal) and X (state), the plaintiffs make two antitrust claims.[5] In Count XI of the First Amended Complaint, plaintiffs make a state law claim of civil conspiracy.

Here, Plaintiff Funds seek to recover costs incurred because of the defendants' alleged wrongful conduct. The Funds characterize their damages as economic losses arising from the "diminishment and expenditure of Fund assets" paid to provide medical treatment for tobacco-related illnesses. Plaintiff Funds also seek treble and twofold damages on their federal and state RICO and antitrust claims, injunctive and declaratory relief, including disgorgement, and restitution and punitive damages.

On September 10, 1998, this Court denied motions by the defendants to dismiss this case pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state claims upon which relief could be granted [Doc. 234]. On September 14, 1998, this Court denied motions by Defendants The Tobacco Council, RJR Nabisco Holdings, and RJR Nabisco, Inc. to dismiss this cause pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction [Doc. 238].[6] On September 23, 1998, this Court denied the defendants' motion to dismiss this cause under Fed.R.Civ.P. 12(b)(7) for failure to join necessary parties [Docs. 249, 250]. On October 20, 1998, this Court granted a motion by Plaintiff Funds to certify this litigation as a class action pursuant to Fed.R.Civ.P. 23 [Docs. 309, 310].

### III. Summary Judgment standard

Review of summary judgment motions is controlled by Fed.R.Civ.P. 56(c), which provides in part that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Pursuant to Rule 56, summary judgment will be rendered when requested if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In assessing the merits of the motion, this court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the nonmoving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997).

However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence or specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 256 (6th Cir.), *cert. denied*, — U.S. —, 119 S.Ct. 278, 142 L.Ed.2d 230 (1998).

Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is

---

dants); and Count XIV (Ohio RICO, Ohio Rev. Code § 2923.31 *et seq.*, except against Defendants Council for Tobacco Research, The Tobacco Institute, and Hill & Knowlton).

5. Plaintiffs' antitrust claims include one federal claim for violations of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and one state law claim for

violations of the Valentine Act, Ohio Rev.Code. § 1331.01 *et seq.*

6. In that same opinion and order, the Court granted the motion to dismiss by Defendant B.A.T. Industries, p.l.c., as the Court found it lacked personal jurisdiction over this foreign corporation.

so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505.

Summary judgment also is appropriate when a court determines a plaintiff filed suit outside the appropriate statute of limitations and dismisses a claim as time-barred. *See Caproni v. Prudential Sec., Inc.*, 15 F.3d 614, 616 (6th Cir.1994); *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992).

The Court now reviews defendants' first motion and decides whether the defendants' are entitled to judgment on the basis that plaintiffs' five remaining claims were filed outside the appropriate statutes of limitation.

### IV. Statutes of Limitation

The five remaining counts in the First Amended Complaint all have a four-year statute of limitations, except the five-year statute of limitations for violation of the Ohio Pattern of Corrupt Activity Act (Ohio RICO) under Count XIV.

Under the Ohio Corrupt Activity Act, the five-year statute of limitation does not run until five years after the unlawful conduct ends or the cause of action accrues. As to plaintiffs' other claims, plaintiffs argue that these statutes of limitation do not stop their claims because of the fraudulent concealment doctrine or because each cause of action did not accrue until recently. Because plaintiffs' federal RICO claim and federal and state antitrust claims have different rules governing accrual, the Court examines these separately. The Court first will examine whether there is any merit to invoking the fraudulent concealment exception to escape any time bars.

### A. Fraudulent concealment

■ The plaintiffs say the running of the statutes of limitation were tolled by defendants' fraudulent concealment. With respect to antitrust and federal RICO actions, courts in the Sixth Circuit require a plaintiff to show the following elements to invoke the fraudulent concealment exception: (1) defendants' wrongful concealment of their actions; (2) failure of the plaintiff to discover operative facts that are the basis of his cause of action; and (3) the plaintiff exercised due diligence in seeking out facts supporting a cause of action. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975); *Montgomery v. Jones Chems., Inc.*, No. 1:94 CV 0847, 1995 WL 523617, at *2 (N.D.Ohio June 7, 1995).

■ The Supreme Court of the United States, in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), emphasized that a plaintiff claiming relief from a statute of limitations on fraudulent concealment grounds must show due diligence. *Id.* at 1993 (" 'reasonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment' ") (citation omitted).[7]

Plaintiffs plead fraudulent concealment near the end of the First Amended Complaint in a section entitled "Tolling of the Applicable Statutes of Limitation." These three paragraphs of the First Amended Complaint[8] lack the specificity required un-

---

7. In *Klehr*, the Supreme Court recognized the applicability of the fraudulent concealment doctrine specifically in civil RICO cases. The Court also noted the effect of the doctrine in antitrust cases, such as a comment that a plaintiffs behavior was not irrelevant to applying the doctrine "to antitrust or to civil RICO." *Id.* at 1993. The Court notes too that Congress "consciously patterned civil RICO after the Clayton Act." *Id.* at 1990. Therefore, this Court does not hesitate to discuss the fraudulent concealment doctrine in the context of plaintiffs' federal and state RICO claims. However, the Ohio Corrupt Activity Act claim also allows a claim "at any time within five years after the unlawful conduct terminates or the cause of action accrues."

8. *See* Section P, First Amended Complaint: "Tolling of the Applicable Statutes of Limita-

tion," including ¶¶ 252, 253 and 254. Paragraph 254 reads, in pertinent part:

> Until very recently, ... Plaintiffs and members of the Class and their participants and beneficiaries could not reasonably have discovered the wrongdoing at any time prior to this time, nor could the Plaintiffs and members of the Class and their participants and beneficiaries have, as a practical matter, taken legally effective action given the unavailability, until very recently, of internal memoranda and other documents (as generally described herein) as evidence in support of their claims. Defendants have attempted and are continuing their attempts to keep such internal information from reaching Plaintiffs and members of the Class and their participants and beneficiaries. Indeed, Defendants still refuse to admit, and continue to conceal, the fact that using Defendants' tobacco products causes disease and

der Fed.R.Civ.P. 9.[9]

■ Merely invoking the doctrine does not satisfy the law. "Under F.R.Civ.P. 9(b), the party alleging fraudulent concealment must plead the circumstances giving rise to [the concealment] with particularity." *Dayco Corp.*, 523 F.2d at 394; *see also Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 356 (6th Cir.1987) (explaining that plaintiff facing motion to dismiss had to plead "circumstances which would indicate why the alleged fraud was not discovered earlier and which would indicate why the statute should be tolled.").

■ Because " 'statutes of limitation are vital to the welfare of society and are favored in the law,' the plaintiff who invokes the doctrine of fraudulent concealment will be 'held to stringent rules of pleading and evidence....' " *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir.) (citation omitted), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Plaintiffs bear the ultimate burden of proving each of *Dayco's* three elements. *Id.* If a plaintiffs complaint is deficient in pleading all three elements, "it is sufficient to observe that plaintiffs have failed to plead their own due diligence with the requisite particularity demanded by Rule 9(b)." *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir.1991).

■ Without reaching any decision on plaintiffs' compliance with two of the elements, this Court observes that plaintiffs have failed to plead their due diligence with any specificity. *See* Doc. 14, at ¶ 254. Therefore, these Taft–Hartley Funds cannot use the fraudulent concealment exception to escape the statute of limitations. *Friedman*, 929 F.2d at 1159–60; *Pinney Dock*, 838 F.2d at 1478 ("To hold that a tolling or suspension of the limitation of actions must continue unless or until proof positive existed of a wrong ... would abort the policy of the law of repose in statutes of limitations....").

that nicotine in Defendants' cigarettes is addictive. The cigarette manufacturers still refuse to admit that they have manipulated the level and delivery of nicotine in their cigarettes. First Amended Complaint at ¶ 254.

9. Fed.R.Civ.P. 9(b) reads in part:

### B. State RICO statute of limitations

■ In Count XIV of the First Amended Complaint, Plaintiff Funds make claim under the Ohio RICO statute, the Ohio Pattern of Corrupt Activity Act. Ohio Rev.Code § 2923.34(K) gives the statute of limitations for the state RICO claim. This provision allows an action within five years of the latest of three dates. Section 2923.34(K) provides that

[n]otwithstanding any other provision of law providing a shorter period of limitations, a civil proceeding or action under this section *may be commenced at any time within five years after the unlawful conduct terminates or the cause of action accrues* or within any longer statutory period of limitations that may be applicable.

Ohio Rev.Code § 2923.34(K) (emphasis added).

Under the first possible limitations period, Plaintiff Funds' claim under the Ohio Pattern of Corrupt Activity Act (Count XIV) is timely if brought "within five years after the unlawful conduct terminates." As discussed, plaintiffs show evidence that the defendants' alleged unlawful conduct has not ended and is ongoing.

Plaintiffs claim the defendants knew that tobacco caused major health conditions, including lung cancer and heart disease, among other conditions. Plaintiffs also claim that defendants knew that nicotine in tobacco was addictive. Despite such knowledge, plaintiffs say defendants fraudulently denied a relationship between tobacco use and these health conditions, including denials in 1994 and after. Despite such knowledge, plaintiffs also say defendants fraudulently denied that nicotine was addictive, including denials in 1994 and after.

As partial support, plaintiffs cite a June 11, 1958 memorandum prepared by scientists from Defendant British–American Tobacco Co., Ltd. ("BAT"). In that memorandum,

**(b) Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

these scientists sought information "from our contacts in U.S.A. and Canada" "on ... the extent to which it is accepted that cigarette smoke "causes" lung cancer." The scientists reported:

> [T]he individuals whom we met believed that smoking causes lung cancer if by "causation" we mean any chain of events which leads finally to lung cancer and which involves smoking as an indispensable link. In the U.S.A. only [Joseph] Berkson [a CTR Special Projects Researcher] apparently, is now prepared to doubt the statistical evidence and his reasoning is nowhere thought to be sound.[10]

The scientists from BAT summarized Berkson's belief.

> Although there remains some doubt as to the proportion of the total lung cancer mortality which can fairly be attributed to smoking, scientific opinion in [the] U.S.A. does not now seriously doubt that the statistical correlation is real and reflects a cause and effect relationship.

In a November 2, 1959–report, RJR scientist Alan Rodgman discussed "[a]rguments and conclusions by those claiming cigarette smoke as a health hazard are presented as well as counter arguments and conclusions."[11] Rodgman opined: "These findings indicate that cigarette smoking increases the risk of developing lung cancer. Many authorities believe the relationship to be one of cause-and-effect."[12] RJR scientist Rodgman summarized his opinion: "[T]he amount of evidence accumulated to indict cigarette smoke as a health hazard is overwhelming ... [while] [t]he evidence challenging such an indictment is scant."

Plaintiffs show evidence that from at least 1969, tobacco companies believed that smoking during pregnancies injured the development of the child. One 1969 Phillip Morris study stated:

> Now we have a study of the effect of smoking in pregnancy which supports previous conclusions that smoking mothers produce smaller babies. The position of the medical people is that smaller babies suffer detrimental effects all through life. For example, in identical twins, the smaller one at birth has lower intelligence test scores at age 10.[13]

The scientific opinion of other tobacco defendant scientists was to like effect.

Plaintiffs give evidence that the defendants publicly denied that tobacco caused disease at times when the above-cited documents suggest otherwise. Plaintiffs show a December 27, 1962, Tobacco Institute press release that stated:

> The causes of cancer are not now known to science. Many factors are being studied along with tobacco. The case against tobacco is based largely on statistical association studies, the meanings of which are in dispute.[14]

In 1967, the Vice President and General Counsel of Defendant Phillip Morris stated: "The truth of the matter is this: No one knows whether cigarette smoking causes any human disease or in any way impairs human health."[15] The General Counsel also said "[n]obody has yet been able to find any ingredient as found in tobacco or smoke that causes human disease."[16] Other documents similarly denied any relation between tobacco use and disease.

Plaintiffs show evidence that defendants' continuous public denial of any relationship with disease is inconsistent with private or internal industry documents. In a 1983 advertisement, Defendant RJR made the following statement:

> It has been stated so often that smoking causes cancer, it's no wonder most people believe this is an established fact.
>
> But, in fact, it is nothing of the kind.
>
> The truth is that almost three decades of research have failed to produce scientific proof for this claim.

\*      \*      \*      \*      \*      \*

10. Pl.Exh. 18. The memorandum reported one exception, H.S.N. Greene, who was an individual not associated with defendants.

11. Pl.Exh. 25.

12. *Id.*

13. Pl.Exh. 55.

14. Pl.Exh. 30.

15. Pl.Exh. 46.

16. *Id.*

In our opinion, the issue of smoking and lung cancer is not a closed case. It's an open controversy.[17]

Plaintiffs also show a July 17, 1963 report by Addison Yeaman, counsel for Defendant Brown & Williamson. Yeaman wrote his report near the release of the 1964 Surgeon General's Report. Predicting that the Surgeon General's reviewing panel would find a causal link between cigarette smoking and lung cancer, Yeaman recommended:

Certainly one would hope to prove there is no etiological factor [disposing to cancer] in smoke but the odds are greatly against success in that effort. At the best, the probabilities are that some combination of constituents of smoke will be found conducive to the onset of cancer or to create an environment in which cancer is more likely to occur.[18]

Plaintiffs claim that, despite knowledge to the contrary, defendants have denied that tobacco is addictive. In this report, Yeaman also acknowledges the addictive quality of nicotine. He states: "[N]icotine is addictive. We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms."[19]

Additionally, plaintiffs show a 1972 report of findings made at a conference sponsored by the Tobacco Institute. Reporting on the conference, Defendant Phillip & Morris scientist William Dunn reported:

[A]ccept the proposition that nicotine is the active constituent of cigarette smoke. Without nicotine, the argument goes, there would be no smoking. Some strong evidence can be marshalled to support this argument:

1) No one has ever become a cigarette smoker by smoking cigarettes without nicotine.

2) Most of the physiological responses to inhaled smoke have been shown to be nicotine-related.

3) Despite many low nicotine brand entries into the marketplace, none of them have captured a substantial segment of the market.[20]

Dunn described the cigarette product as follows:

The cigarette should be conceived not as a product but as a package. The product is nicotine.

\*     \*     \*     \*     \*     \*

Think of the cigarette pack as a storage container for a day's supply of nicotine.

\*     \*     \*     \*     \*     \*

Think of the cigarette as a dispenser for a dose unit of nicotine.[21]

Other cigarette executives and scientists shared a similar belief that nicotine is addictive. Defendant Brown & Williamson scientist Steele wrote in 1978 that "[v]ery few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison."[22]

The tobacco industry also sought to represent nicotine as not addictive despite the many internal documents recognizing its addictive qualities. In a press release dated May 16, 1988, entitled "Claims that Cigarettes are Addictive Contradict Common Sense," the Defendant Tobacco Institute announced that "[s]moking is truly a personal choice which can be stopped if and when a person decides to do so."[23] This press release stated further that common sense "contradict[s] any claim that smoking is an 'addiction.'"[24] The Tobacco Institute concluded the press release by stating that "[t]he claims that smokers are 'addicts' defy common sense and contradict the fact that people quit smoking everyday."[25]

---

17. Pl.Exh. 165.

18. Pl.Exh. 32 at 4 ("Implications of Battelle Hippo I & II and the Griffith Filter," July 17, 1963). *See also* Exh. 31 (a BAT report entitled "A Tentative Hypothesis on Nicotine Addiction," prepared by G. Kaselbach and O. Libert, May 30, 1963).

19. *Id.*

20. Pl.Exh. 65.

21. *Id.*

22. Pl.Exh. 91.

23. Pl.Exh. 133.

24. *Id.*

25. *Id.*

**812**

A Tobacco Institute spokesperson stated during a 1989 interview broadcast on national television that "I can't allow the claim that smoking is addictive to go unchallenged."[26] The tobacco industry represented that smoking is not addictive again in 1992, when Defendant Philip Morris distributed a pamphlet that stated that "[t]hose who term smoking an addiction do so for ideological—not scientific—reasons."[27] Similarly, in a press release dated March 25, 1994, the Tobacco Institute again claimed that smoking is not addictive. This press release stated that " '[f]rom a practical, clinical and scientific perspective, cigarette smoking behavior is not the same as seen in actual hard drug addiction. In order to include smoking as an addiction, one must redefine that term, water down its meaning, and ignore critical differences involving every aspect of these behaviors.' "[28]

In making a claim that defendants acted wrongfully in denying that tobacco is addictive, plaintiffs say defendants early recognized that tobacco was addictive. Plaintiffs say that despite this belief, defendants continued to deny that nicotine was addictive.

Plaintiffs show evidence that the defendants' wrongful conduct continued and included testimony of the cigarette companies' chief executives. On April 14, 1994, the chief executive officers of the tobacco companies testified before Congress that they believed the nicotine in cigarettes is not addictive.[29] Plaintiffs claim other conduct continued after 1993.[30]

Plaintiffs show some evidence that plaintiffs only recently came to know of much of this wrongdoing. Plaintiffs say their awareness of the defendants' alleged conduct resulted from the recent disclosure of internal tobacco industry documents. The Court finds that a material factual issue exists whether Ohio Rev.Code § 2923.34(K) stops plaintiffs' Ohio Corrupt Activity Act claim (Count XIV).

---

**26.** Pl.Exh. 135 (Transcript of "Good Morning America").

**27.** Pl.Exh. 139.

**28.** Pl.Exh. 145.

**29.** On April 14, 1994, the tobacco companies' CEOs before the Subcommittee on Health and the Environment of the Committee on Energy 7 Commerce. These executives testified that nicotine was not addictive:

> Phillip Morris executive William Campbell testified: "I believe that nicotine is not addictive, yes."
>
> *     *     *     *     *     *
>
> RJR executive James Johnston testified: "Mr. Congressman, cigarettes and nicotine clearly do not meet the classic definition of addiction."
>
> *     *     *     *     *     *
>
> Lorillard executive Andrew Tisch testified: "I believe that nicotine is not addictive."
>
> *     *     *     *     *     *
>
> Brown & Williamson executive Thomas Sandefur testified: "I believe that nicotine is not addictive."
>
> *     *     *     *     *     *
>
> American Tobacco Company executive Donald Johnston testified: "And I, too, believe that nicotine is not addictive."
>
> *     *     *     *     *     *
>
> United States Tobacco executive Joseph Taddeo testified: "I don't believe that nicotine or our products are addictive."

Pl.Exh. 146.

**30.** On April 15, 1994, Defendant Philip Morris published an advertisement in The New York Times stating that "Philip Morris does not believe that cigarette smoking is addictive."

Pl.Exh. 147.

Defendant Brown & Williamson issued a similar statement in a May 10, 1994 press release. This press release declared that "[i]t has always been B & W's position—and still is—that cigarette smoking is not addictive."

Pl.Exh. 150.

Additionally, in its May 12, 1997 issue, Time Magazine reported that James Morgan, president of Philip Morris, had given the following testimony in a sworn deposition:

> If [cigarettes] are behaviorally addictive or habit forming, they are much more like ... Gummi Bears. I love Gummi Bears ... and I want Gummi Bears, and I Like Gummi Bears, and I eat Gummi Bears, and I don't like it when I don't eat my Gummi Bears, but I'm certainly not addicted to them.

Pl.Exh. 153 at 27.

Under Ohio Rev.Code § 2923.34(K), the plaintiffs can bring their Ohio Corrupt Activity Act claim "at any time within five years after the unlawful conduct terminates or the cause of action accrues." The Ohio General Assembly has discretion in determining the proper accrual rule for the Ohio Corrupt Activity Act. Unless constitutionally unreasonable, the Court cannot question the General Assembly's determination.

Accordingly, because Plaintiff Funds give evidence that the defendants' purportedly unlawful conduct continued to within five years of this action, the Court denies the defendants' motion for judgment on a state statute of limitations grounds.[31]

C. Federal RICO statute of limitations

■ In civil RICO claims, federal law determines when a claim accrues for purposes of the statute of limitations. *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.*, 906 F.2d 1546, 1550 (11th Cir.1990), *cert. denied*, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991). Under 18 U.S.C. §§ 1962(a)–(d), the statute of limitations for RICO claims is four years. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

In *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), the Supreme Court clarified when a civil RICO cause of action begins to accrue. In *Klehr*, the Court rejected the Third Circuit's "last predicate act" rule. Under the "last predicate act" rule, a party could recover for all damages caused by the total "pattern" of racketeering activity if the defendant committed one predicate act within the limitations period. *Id.* at 1989.

Instead of using the "last predicate act" rule, the *Klehr* Court held that courts should use the "injury and pattern" discovery accrual rule. *Id.* at 1991–92.[32] The Sixth Circuit had earlier adopted the injury and pattern standard in *Caproni v. Prudential Sec., Inc.*, 15 F.3d 614, 619–20 (6th Cir.1994).

In *Caproni*, the Sixth Circuit held that "[a] civil RICO cause of action begins to accrue as soon as a plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *Id.* at 619. The *Caproni* decision followed the Sixth Circuit decision in *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 241 (6th Cir.1992). In *Caproni*, the Sixth Circuit used the accrual rule set forth in *Bivens. Caproni*, 15 F.3d at 620. The *Bivens* rule differs from the discovery rule in that the former "requires that a plaintiff discover, or be in a position to discover, the existence of a pattern of racketeering activity in addition to the existence and source of the injury." *Id.*

The *Bivens* rule applies the discovery rule to both injury and pattern elements to "properly advance the broad remedial nature of civil RICO." *Bivens*, 906 F.2d at 1555.[33] According to the Eleventh Circuit, requiring

---

**31.** Ohio Rev.Code § 2923.34(K) also allows a claim under the Ohio Corrupt Activity Act to be filed within five years *of the time the cause of action accrues*. That possibility provides for filing suit five years after the cause of action accrued. As applied to plaintiffs' federal RICO claim, it is unclear when the named plaintiffs discovered or should have discovered their RICO-type injury or injuries, and the date or dates on which the named plaintiffs knew or should have known of the "pattern of racketeering."

The Court notes that the second limitations possibility, which closely resembles the rule for the federal RICO claim, has been used by other federal courts sitting in Ohio. *See Baker v. Pfeifer*, 940 F.Supp. 1168, 1181 (S.D.Ohio 1996); *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F.Supp. 49, 81 (S.D.Ohio 1986). However, these cases did not involve claims of an ongoing conspiracy, as are at issue in this litigation.

**32.** While the Court in *Klehr* rejected the so-called "last predicate act" rule because the plaintiffs' civil RICO claim could have been timely only under that rule, it did *not* decide the validity of the accrual rules applied by other circuits. *Id.* at 1989–91. *See generally* Thomas H. Harris, *Recent Development: Klehr v. A.O. Smith Corporation: The Supreme Court Attempts to Define the Statute of Limitations and the Application of the Fraudulent Concealment Doctrine in Civil RICO Actions*, 24 J.Contemp.L. 131 (1998).

**33.** The Eleventh Circuit panel in *Bivens* further explained its rationale by noting that "[t]he Supreme Court [had] describe[d] RICO as 'an aggressive initiative to supplement old remedies and develop new methods for fighting crime.' The language of the statute, as well as 'Congress' self-consciously expansive language and overall approach" mandate that RICO is to be read broadly. *Bivens*, 906 F.2d at 1555 n. 11 (citations omitted).

plaintiffs to prove injury as part of a pattern of racketeering activity "also furthers the purposes" of a four-year statute of limitations because a four-year range limits discovering and acting on one's entitlement to civil RICO damages. *Id.*

Federal district courts in Ohio also have considered the advantages of a discovery rule that applies to both injury and pattern elements. In *Randolph County Fed. Sav. & Loan Ass'n v. Sutliffe,* 775 F.Supp. 1113 (S.D.Ohio 1991), a civil RICO action brought by defrauded investors, District Judge Rubin followed the injury and pattern discovery rule. In *Randolph,* the district court found that a RICO cause of action accrues and the statute of limitations begins to run "when the plaintiffs discovered or reasonably should have discovered the existence and source of the injury . . . and that the injury was part of a pattern of racketeering activity." *Id.* at 1118. Judge Rubin explained:

> The rationale underlying this rule is that a RICO cause of action cannot accrue until all of its elements are present. Because the elements of a RICO violation include injury and a pattern of racketeering activity, a claimant cannot sue for a RICO violation until the damage to him is part of a pattern.

*Id.* at 1117 (citations omitted).

In *Randolph,* the court observed that "a discovery rule that applies to both the injury and pattern elements advances the broad, remedial nature of RICO, since an injured party must have reason to know his injury is part of a pattern of racketeering activity before he can bring suit." *Id.* at 1118.

In a later RICO case, District Judge Rubin refused to dismiss a plaintiff landlord's civil RICO claim as time-barred. *See Shuttlesworth v. Housing Opp. Made Equal,* 873 F.Supp. 1069 (S.D.Ohio 1994). There, Judge Rubin acknowledged that, in the Sixth Circuit, "the running of the limitations period is tied to the Plaintiff's *discovery* of the scheme against him." *Id.* at 1079 (emphasis in original). Judge Rubin stated:

> While the Court agrees that Plaintiff must have been aware in 1984 of the harassment actions then pending against him, *we cannot conclude that Plaintiff also realized at that time that such harassment actions were the product of the RICO conspiracy that he now alleges.*

*Id.* (emphasis added).[34]

In the instant case, the Court cannot conclude that plaintiffs here discovered their injuries to business or property resulted from the defendants' conspiracy, scheme and pattern of racketeering activity more than four years before they filed this action. Further, even if one assumes that plaintiffs knew of their injury, defendants do not show that plaintiffs were aware of the claimed RICO conspiracy.

Plaintiff Funds have raised a material factual dispute on when the plaintiffs discovered, or should have discovered a pattern of racketeering activity. The Court finds the trier of fact should determine whether plaintiffs have satisfied the discovery accrual rule for their RICO claim.[35]

Accordingly, the defendants are not entitled to partial summary judgment on their

**34.** *See also Nagel v. First of Michigan Corp.,* 784 F.Supp. 429, 437–38 (W.D.Mich.1991) (genuine issues of fact precluded summary judgment on statute of limitations issue in plan's civil RICO action, such as when pension plan should have known of racketeering injury); *Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 656 F.Supp. 49, 81–82 (S.D.Ohio 1986) ("the mere fact that plaintiffs were aware of a defect [in the nuclear reactor supplied by defendants] as early as 1975 does not necessarily mean that they had reason to know of possible fraud . . . given the complexity of the relationship and transactions between the parties, the question of when plaintiffs had reason to know of the fraud or should have discovered it by exercising due diligence [is] better left for the jury.").

**35.** In a post-*Klehr* decision, a federal district court denied defendants' summary judgment motion in a civil RICO action, finding there were genuine issues of material fact as to when plaintiffs' claims accrued under the injury-and-pattern-discovery rule. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* Nos. Civ. A. 91–2133–EEO, Civ. A. 95–2267–EEO, 1997 WL 548880 (D.Kan. Aug.26, 1997). Observing that "[w]hen a cause of action accrued is a question of fact," *id.* at *4. In this case, the court stated that "genuine issues of fact exist as to when plaintiffs discovered or reasonably should have discovered that their injuries resulted from a pattern of racketeering activity, i.e., mail and/or wire fraud. Existence of a pattern is a question of fact for the jury." *Id.*

first motion related to the RICO statute of limitations.

## D. Antitrust statute of limitations

Plaintiffs make two antitrust claims, one based on a federal antitrust statute and one based on a state antitrust statute. Both are subject to four-year statutes of limitation. Both require that antitrust claims be filed "within four years after the cause of action accrued." *See* 15 U.S.C. § 15(b);[36] Ohio Rev.Code § 1331.12(B).[37] Because the federal Clayton Act claim (Count IV) and the state Valentine Act claim (Count X) have the same statute of limitations, the Court addresses the defendants' statutes of limitation arguments on these claims together.[38]

■■■■ An antitrust cause of action accrues and the statute of limitations period begins to run "each time a defendant commits an act that injures the plaintiff's business." *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir.1996) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) and *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir.1990)). An antitrust plaintiff may recover damages occurring within the limitations period that result from conduct occurring before that period if, at the time of the conduct, those damages were speculative, uncertain, or otherwise incapable of proof. *Zenith Radio*, 401 U.S. at 338–42, 91 S.Ct. 795.

■■■■ Here, Plaintiff Funds argue that the evidence underlying their antitrust claims shows a continuing antitrust violation, making the four-year time bar not applicable. A continuing antitrust violation "is one in which the plaintiff's interests are repeatedly

invaded." *DXS, Inc.*, 100 F.3d at 467. When a plaintiff alleges a continuing antitrust violation, the plaintiff must show some overt act by the defendant to restart the statute of limitations period anew. *Id.* The four-year statute of limitations then would run from the date of the last overt act. *Id.*

The Sixth Circuit has held that an "overt act" restarting the statute of limitations must have two elements: "(1) it must 'be a new and independent act that is not merely a reaffirmation of a previous act'; and (2) it must 'inflict new and accumulating injury on the plaintiff.' " *Id.* (citations omitted).

■■■■ In the case *sub judice*, the injuries suffered by the plaintiffs within four years of the filing of this action were not new and independent injuries, but rather, a single, continuous course of injury. Moreover, the acts complained of were "merely a reaffirmation of a previous act." *Id.* at 467–68.

Plaintiffs rely more on the fraudulent concealment exception to overcome defendants' antitrust statute of limitations defense.[39] They do not specifically discuss a new and independent "overt act" for purposes of showing a continuing antitrust violation.

Plaintiffs cite the testimony of the chief executives of some defendant cigarette manufacturers. During widely-publicized congressional hearings in April 1994, these executives deny that nicotine was addictive. As late as 1994, representatives of some defendants made allegedly misleading statements that distorted information about smoking and health. *See* text discussion, *infra*, at Part IV, Section B. Plaintiffs also generally allege that defendant cigarette manufacturers and

---

**36.** 15 U.S.C. § 15(b) reads:

Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred *unless commenced within four years after the cause of action accrued.* No cause of action barred under existing law on the effective date of this Act shall be revived by this Act. (emphasis added).

**37** **Ohio Rev.**Code § 1331.12(B) reads:

A cause of action for any violation of sections 133.01 to 1331.14 of the Revised Code [state restraints of trade statutes] other than one upon which action is brought by the attorney general or a prosecuting attorney, and other

than one upon which action was brought in any court by any person not later than forty-five days after the effective date of this amendment, shall be forever barred *unless commenced within four years after the cause of action accrued.* (emphasis added).

**38.** Before a 1994 amendment by the state legislature, there was no statute of limitations for actions brought under Ohio's Valentine Anti–Trust Act. *See* Ohio Rev.Code § 1331.12, amendment note (Banks–Baldwin 1994).

**39.** *See* Doc. 319, Plaintiffs' Motion in Opposition to Defendants' Motions for Summary Judgment, at pp. 56–61.

816

their trade associations "continue to this day to repeat over and over" misleading and deceptive representations about the health effects of smoking.

In making the argument that defendants' misconduct continued, plaintiffs say only that defendants continued the same denials that defendants had been giving for years. The Court finds the conduct complained of was not "new and independent." Instead, the acts of defendants within four years of the filing of this action were "merely a reaffirmation of a previous act."

The Court finds no material issues. The Court concludes that defendants are entitled to judgment on plaintiffs antitrust grounds. The Court gives defendants judgment as to plaintiffs' antitrust claims (Counts IV and X).

###      E. Civil Conspiracy

█   Plaintiffs also make a civil conspiracy claim premised on common law fraud.[40] In Ohio, the statute of limitations for a common law fraud action is four years. Ohio Rev.Code § 2305.09(C). The limitation period does not commence on claims grounded in fraud until the complainants have discovered, or should have discovered, the fraud. *Militsky v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 540 F.Supp. 783, 785 (N.D.Ohio 1980) (citing *Gaudin v. K.D.I. Corp.*, 417 F.Supp. 620, 629 (S.D.Ohio 1976), *aff'd*, 576 F.2d 708 (6th Cir.1978)).

█   "Discovery" under Ohio Rev.Code § 2305.09 means actual discovery, or what a plaintiff might have discovered in the exercise of due diligence. *Copeland v. Delvaux*, 89 Ohio App.3d 1, 5, 623 N.E.2d 569 (1993). In other words, " '[i]nformation sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence.' " *Id.* at 6, 623 N.E.2d 569 (quoting *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir.1985)).

█   While defendants are correct that the evidence tends to show that plaintiffs may have been aware for decades of the risks of smoking. Any such knowledge does not necessarily mean that the trustees of these

Taft–Hartley Funds were on inquiry notice of the "possibility of wrongdoing."

In view of the Court's finding that factual disputes stop summary judgment on the statute of limitations grounds on other claims, this Court declines to find that plaintiffs filed their civil conspiracy claim outside the relevant state statute of limitations. Rather, the Court concludes that a factual dispute remains on when Plaintiff Funds discovered the civil conspiracy and its attendant predicate acts. Therefore, the Court will deny defendants partial summary judgment on the civil conspiracy count.

###      F. Statute of limitations summary

Under the Ohio Corrupt Activity Act, the plaintiffs may file an action within five years after the unlawful conduct ends. Plaintiffs show evidence that defendants committed unlawful acts within five years of the filing of this action. The Court must deny defendants' request for summary judgment as to plaintiffs' Ohio Corrupt Activity Act claim.

Plaintiffs fail to plead or sufficiently show due diligence sufficient to extend the statute of limitations on fraudulent concealment grounds. Therefore, plaintiffs are not entitled to use the fraudulent concealment exception to the statute of limitations.

Although plaintiffs may not use fraudulent concealment grounds to extend the statute of limitations, factual disputes exist whether plaintiffs knew of both the existence and source of their injury and that the injury is part of a pattern. Because material issues exist whether plaintiffs knew that their injury was part of a pattern, the Court denies defendants' motion for summary judgment on limitations grounds as to plaintiffs' federal RICO claim.

As to plaintiffs' state and federal antitrust claims, the Court finds that plaintiffs fail to establish a continuing antitrust violation. While plaintiffs show wrongdoing within the statute of limitations, the acts complained of being not new and independent acts. Instead, they reaffirm previous acts.

---

**40.** This court has ruled that the plaintiffs' claims for federal and state antitrust, federal RICO, and Ohio Pattern of Corrupt Activity Act violations are the underlying causes of action that will support a separate conspiracy claim. *Iron Workers Ins. Fund No. 17 v. Philip Morris Incorporated*, 23 F.Supp.2d 771 (N.D.Ohio 1998).

Finally, the Court finds material issues whether plaintiffs were actually aware, or should have been aware of defendants' wrongdoing with the statutory period. Material factual disputes stop judgment on statute of limitations grounds as to plaintiffs' civil conspiracy claim.

The jury will be better able to decide unresolved factual questions after hearing evidence at trial. *See United Phosphorus, Ltd.*, 1997 WL 548880, at *5; *State of Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 585 F.2d 454, 457 (10th Cir.1978), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981) ("a trial court should not grant summary judgment for a defendant if there is a 'viable issue of fact' as to when the limitations period began.").

## V. The Second Summary Judgment Motion

▆▆▆ In their second motion, defendants argue that plaintiffs' claim for civil conspiracy (Count XI) fails as a matter of law. In claiming that the Court should give defendants judgment on plaintiffs' civil conspiracy claim, the tobacco defendants say a civil conspiracy claim cannot rest on underlying torts that are themselves conspiracies. Defendants also argue that punitive damages are inappropriate where the underlying violations do not provide for such a remedy.

Ohio courts define a charge of civil conspiracy under state law as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 650 N.E.2d 863 (1995) (citing *LeFort v. Century 21–Maitland Realty Co.*, 32 Ohio St.3d 121, 126, 512 N.E.2d 640 (1987) and *Minarik v. Nagy*, 8 Ohio App.2d 194, 196, 193 N.E.2d 280 (1963), *appeal dismissed*, 176 Ohio St. 326, 199 N.E.2d 404 (1964)). The "ultimate" fact of conspiracy is a jury question "unless the court can say, as a matter of law, that there is no proof tending to establish a conspiracy." *LeFort*, 32 Ohio St.3d at 126, 512 N.E.2d 640.

In denying an earlier motion to dismiss the plaintiffs' civil conspiracy claim, this Court noted that "[a]n actionable conspiracy must be based upon an actionable underlying tort" and recognized that plaintiffs' claims for violations of federal and state RICO and antitrust laws sufficed. *See* Doc. 234, at 44–45. Neither of the RICO-type claims under Counts I and and XIV are specifically defined as conspiracies. The Court concedes that Plaintiff Funds do intend to prove all the defendants engaged in conspiracies to prove their remaining RICO-type claims.

A federal district court that has addressed the issue, at least in the antitrust context, has ruled that a state civil conspiracy claim cannot rest on underlying unlawful acts that are themselves conspiracies. *Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, No. 93–C–5578, 1994 WL 698486 (N.D.Ill.Dec.12, 1994) (finding civil conspiracy is a recognized cause of action in Illinois). In *Nichols*, District Judge Castillo said plaintiffs alleged violations of federal and state antitrust law could not support the civil conspiracy claim. *Id.* at *4. A violation of Illinois antitrust law could not support the civil conspiracy claim because of a specific instruction to that effect in the state statute. *Id.*[41] As to using violations of federal antitrust law to support the state civil conspiracy claim, Judge Castillo noted:

> The Sherman Act claims, by definition, allege an unlawful conspiracy. However, the Seventh Circuit held that a civil conspiracy count cannot be premised on an underlying tort which is defined as a conspiracy. *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir.1982) (district court properly dismissed the plaintiff's civil conspiracy count where the alleged fraud was defined as a conspiracy) [, *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982) ]. Furthermore, to allow a civil conspiracy claim to stand where the underlying tort by its nature involves concerted activity would be en-

---

**41.** [Plaintiff] may not rely on the alleged violations of the Illinois Antitrust Act as a basis for its civil conspiracy claim, because § 9 of the Act expressly prohibits [plaintiff] from alleging a civil conspiracy based upon a purported violation of that Act:

> No contract, combination, conspiracy, or other act which violates this Act shall constitute or be deemed a conspiracy at common law.

*Nichols*, 1994 WL 698486, at *4.

tirely duplicative. *Id.; Belkow v. Celotex Corp.,* 722 F.Supp. 1547, 1550–51 (N.D.Ill. 1989). We find that [plaintiff's] alleged civil conspiracy count is redundant and duplicative of the antitrust claims in Counts I–VI of the Third Amended Complaint.

*Id.* at *4.

In the instant case, the remaining federal and state RICO claims rely on the notion of "concerted activity," which defendants say too closely resembles conspiracy. Defendants cite Wharton's Rule in further support of their effort to strike the civil conspiracy count.

Wharton's Rule is a rule of nineteenth century criminal law. Defendants wish to apply this rule of criminal law in this civil context.

In nineteenth century editions of his criminal law treatise, which today is known by his name, Professor Francis Wharton reported various cases involving the application of a principle of criminal law. In one such case, *Stewart v. Commonwealth,* 225 Va. 473, 303 S.E.2d 877, 879 (Va.1983) (citing 3 F. Wharton, Criminal Law § 2321, at 78 (6th ed. 1868)), the Virginia Supreme Court summarized Wharton's Rule as follows:

> "When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained."
>
> 2 F. Wharton, Criminal Law § 1604, at 1862 (12th ed.1932). The reason for the rule rests on the nature of the crime of conspiracy, which attempts to punish combination in crime which generates criminal activity " 'not confined to the substantive offense which is the immediate aim of the enterprise.' " The classic Wharton's Rule offenses—crimes such as adultery, incest, bigamy, duelling—"are characterized by the general congruence of the agreement and the completed substantive offense" and, therefore, indictment for conspiracy to commit such crimes is deemed to be unsound. A recent edition of Professor Wharton's text states, as an example of the Rule's application, that there can be no conspiracy between a prostitute and a pan-

derer. 4 Wharton's Criminal Law § 731, at 545 (C. Torcia 14th ed.1981).

*Stewart,* 303 S.E.2d at 879 (internal citations omitted).

Defendants do not cite to any Ohio or federal court decision using Wharton's Rule to narrow the application of Ohio's civil conspiracy law in civil litigation. This Court, in exercising pendent jurisdiction over the civil conspiracy claim, is reluctant to do so.

The definition of state civil conspiracy again is a malicious combination of two or more to injure another, "*in a way not competent for one alone,* resulting in damages." *Kenty,* 72 Ohio St.3d at 419, 650 N.E.2d 863 (emphasis added). An Ohio appellate court said "[i]n away not competent for one alone" means "that if one person could lawfully commit an act, then that act committed by two or more persons cannot support a conspiracy claim, no matter how malicious the 'conspirators,' or how great the resulting 'injury.' " *Gosden v. Louis,* 116 Ohio App.3d 195, 220, 687 N.E.2d 481 (1996).

What this means, the *Gosden* court said, is that the underlying tort must be unlawful "even if committed by one alone." *Id.* at 222, 687 N.E.2d 481. The appellate court reversed a directed verdict on a civil conspiracy claim because the underlying tort, defamation, was "unlawful even if committed by one alone," and most of the defendants intentionally signed the libelous letter. *Id.* at 221–22, 687 N.E.2d 481. The underlying unlawful act must be made in furtherance of the conspiracy. *Williams v. ITT Fin. Serv.,* No. C–960234, 1997 WL 346137, at *5 (Ohio Ct. App.1st Dist. June 25, 1997), *aff'd sub nom. Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 700 N.E.2d 859 (1998).

Violations of RICO, on the state or federal level, are unlawful even in the unlikely event "one alone" commits them. While not torts *per se,* these causes of action are not technically conspiracies either. Because the underlying unlawful acts would be "unlawful even if committed by one alone, Wharton's Rule does not stop" them. The Court finds that defendants are not entitled to judgment on plaintiffs' civil conspiracy claim as a matter of law. Therefore, the Court denies defendants' motion for judgment on plaintiffs' civil

conspiracy claim under Count XI of the First Amended Complaint.

■■■ As for the punitive damages issue, defendants also argue they are entitled to summary judgment on their second motion because the statutes underlying the remaining RICO claims provide for treble damages, but not the award of punitive damages.

The Court notes that Ohio Rev.Code § 2923.34(F) provides for treble damages and not punitive damages for violations of the state RICO statute.[42] The federal RICO statute provides treble damages likewise. *See* 18 U.S.C. § 1964(c). The relevant antitrust statutes provide for threefold and doubled damages, and are silent on punitive damages. *See* 15 U.S.C. § 15; Ohio Rev. Code § 1331.08.

Here, plaintiffs' state claim of civil conspiracy is based on their RICO and antitrust claims. They cannot bring their civil conspiracy claim as a separate tort or claim without the underlying torts. *See Stiles v. Chrysler Motors Corp.,* 89 Ohio App.3d 256, 266, 624 N.E.2d 238 (1993). As none of these underlying causes of action provide for punitive damages, the Court will grant in part this portion of defendants' second motion. *But cf., Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 478, 700 N.E.2d 859 (1998) (punitive damages allowed on civil conspiracy claim but underlying unlawful acts were neither RICO or antitrust violations but fraud).

Accordingly, the Court grants in part and denies in part the defendants' second motion for summary judgment.

## VI. Inability to Prove Causation

■■■ In their third motion for summary judgment, defendants argue for judgment contending plaintiffs fill to prove causation. Defendants contend that plaintiffs cannot satisfy the causation requirements of federal RICO, the Ohio Pattern of Corrupt Activity Act claim, and federal and state antitrust laws.

In making the claim that plaintiffs cannot show causation, defendants first argue that plaintiffs have not shown how they would have acted differently had the defendants not acted unlawfully. Second, defendants say no evidence shows that plaintiffs considered measures to reduce their smoking-related expenditures either before or after learning of defendants' alleged wrongdoing. Third, defendants argue that plaintiffs do not show that their beneficiaries would have acted differently because of hypothetical anti-smoking initiatives by plaintiffs.

In asking for judgment on the argument that plaintiffs cannot show that they, or their beneficiaries, would have acted differently but for defendants' wrongful conduct, the defendants cite to testimony of some trustees. Even on its own terms, defendants do not show that no plaintiff trust fund would have changed its policies if given knowledge that tobacco defendants believed tobacco was harmful or that nicotine was addictive. Defendants' citation to testimony from *some but not all* trustees does not show that no funds would have undertaken smoking cessation programs or altered their benefit mix had the funds been aware of defendants' alleged unlawful conduct.

More important, defendants disregard plaintiffs' evidence showing that defendants' purported conduct had significant deleterious effect upon the plaintiffs. Plaintiffs offer the report of Robert Proctor, Ph.D., a professor of the history of science. In his report, Proctor opines:

American smoking levels would never have risen as high as they did, if the tobacco industry had been honest in its assessment and reporting of well-established facts about the hazard of tobacco. Fewer people would have started smoking, and more people would have quit earlier. Smoking rates would not have grown as rapidly as

---

**42.** Ohio Rev.Code § 2923.34(F) provides:

(F) In a civil proceeding under division (B) of this section, any person directly or indirectly injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section, other than a violator of that section or a conspirator to violate that section, in addition to relief under division (C) of this section, shall have a cause of action for

triple the actual damages he sustained. To recover triple damages, the plaintiff shall prove the violation or conspiracy to violate that section and actual damages by clear and convincing evidence. Damages under this division may include, but are not limited to, competitive injury and injury distinct from the injury inflicted by corrupt activity.

they did in the 1950s, and the decline in smoking rates after 1964 would have occurred much sooner than it did.[43]

Suggesting that smoking rates and resulting health expenses would have been significantly reduced, Dr. Proctor gives evidence that fostered doubt causes individual denial and resulting increased smoking.

To like effect, plaintiffs show opinion evidence of Dr. Jeffrey Harris, M.D., Ph.D., an economist and physician. After reviewing smoking trends after warning information was given, Dr. Harris gives the opinion that "[t]here is substantial evidence that American consumers have reduced their use of cigarettes in response to publicity concerning the health hazards of smoking."[44] Dr. Harris also gives the opinion that publicity that tobacco causes disease especially affects children.[45] *See also*

About whether smoking causes disease, plaintiffs show the testimony of experts saying that smoking is causally related to various serious diseases. For example, plaintiffs give evidence from Ronald Davis, M.D., the Director of the Center for Health Promotion and Disease Prevention at the Henry Ford Health System. Dr. Davis, formerly the Chief Medical Officer of the Michigan Department of Public Health, gives the opinion:

> Cigarette smoking is the most important preventable cause of death in the United States. It is responsible for more than 400,000 deaths each year in this country, more than 1000 per day, or about one fifth of deaths from all causes. This scientific fact is based on a huge body of evidence from epidemiologic, toxicologic, and animal studies.[46]

Defendants dispute the relationship of smoking to disease. Defendants' expert denies any predictive relationship between smoking and coronary heart disease.[47]

In making their claim that plaintiffs cannot prove causation, defendants first argue that the plaintiffs would not have acted differently had the defendants not engaged in the alleged wrongdoing. Also, defendants say there is no evidence that plaintiffs considered any specific measure to reduce their smoking-related expenditures or that their beneficiaries would have acted differently if the funds had enacted anti-smoking initiatives. But this argument speaks to the wrong question.

In Ohio Rev.Code § 2923.34, the Ohio General Assembly provided for a civil action for violation of Ohio Rev.Code § 2923.32. In doing so, the General Assembly addressed who should have standing to bring a civil action for triple damages and attorney's fees. In pertinent part, § 2923.34(F) provides:

> (F) In a civil proceeding under division (B) of this section, any person directly or indirectly injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section, ... shall have a cause of action for triple the actual damages he sustained....

Ohio Rev.Code § 2823.34(F).

With this section, the General Assembly allowed claims for "any person directly or indirectly injured." The Plaintiff Funds show evidence that defendants' acts caused an increase in the number and amount of tobacco use among plaintiffs' beneficiaries. The Court finds plaintiffs' showing sufficient to turn back defendants' request for judgment on plaintiffs' Ohio Corrupt Activity Act claims on causation grounds.

Defendants also seek judgment as to plaintiffs' federal RICO claims. Title 18 U.S.C. § 1964 provides, in part:

**43.** Robert Proctor, Ph.D., November 6, 1998, report at 4.

**44.** Jeffrey Harris, M.D., Ph.D., November 6, 1998, supplemental report at 4.

**45.** *Id.* at 6.

**46.** Dr. Ronald M. Davis, November 6, 1998, report at 1, ¶ 1.

**47.** Thus, defendants give opinion evidence of Dr. ·Henry Mizgala, M.D., a professor of medicine at the University of British Columbia. Dr. Mizgala gives the opinion:

> Although literature has reported that cigarette smoking is a statistical significant coronary heart disease risk factor, the small magnitude of the relative risk does not reflect a clinically significant relative risk in terms of prediction of coronary heart disease on a population basis or in an individual patient

Dr. Henry Mizgala, M.D., November 5, 1998, report at 7–8.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

Section 1964(c) of RICO requires plaintiffs to make two showings to recover damages at trial: (1) that they have suffered injury to their business or property; and (2) that defendants' violations of § 1962 caused their injury. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263 (4th Cir.), *cert. denied*, 513 U.S. 931, 115 S.Ct. 323, 130 L.Ed.2d 283 (1994).[48]

The requirement that a plaintiff suffer an injury to its "business or property" means that the plaintiff must show a proprietary or economic type of damage. *See, e.g., Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("Both RICO and the Clayton Act are designed to remedy economic injury by providing for the recover of treble damages, costs, and attorney's fees.").

The first requirement—injury to business or property—is clearly demonstrable here, subject to proof at trial. Plaintiff Funds have put forth evidence they have sustained "concrete financial loss" by making substantial expenditures to pay for the treatment of smoking-related illnesses and addiction. *See Oscar v. University Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir.), *cert. denied*, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). The Sixth Circuit refers to the loss as money "paid out." *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir.1989), *cert. denied*, 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990).

Plaintiffs show evidence of costs that the trusts paid to treat tobacco-related illnesses suffered by their beneficiaries. Dr. Jeffrey Harris gives the opinion that the six named plaintiffs suffered damage of $58 million, with an extreme confidence range of $34 million to $92 million. He gives the opinion that absent class members suffered damage of $386 million, with an extreme confidence range of $234 to $595 million. Combining these totals, the aggregate damages due to the defendants' alleged misconduct for the period 1972–2007 is $444 million, with an extreme confidence range of $268 million to $687 million.[49] Plaintiffs base this estimate principally on a damage model utilizing government and scientific statistics concerning smoking prevalence and risk of disease. *See Hilao v. Estate of Marcos*, 103 F.3d 767, 782–87 (9th Cir.1996) (use of statistical data to prove damages permissible).

Uncertainty over the precise amount of damage does not preclude recovery. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

Plaintiffs are not barred from recovery where, as here, defendants' violation of RICO precluded the precise ascertainment of the amount of damages attributable to that misconduct by comparison to what would have occurred "in its absence under freely competitive conditions." *Id.* at 264, 66 S.Ct. 574. "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Id.; accord Knutson v. Daily Review, Inc.*, 468 F.Supp. 226, 229 n. 4 (N.D.Cal.1979) (defendants should not profit from their wrongdoing by arguing that plaintiffs' computation of damages is less than exact and precise), *aff'd*, 664 F.2d 1120 (9th Cir.1981).

To establish injury from the RICO predicate acts, plaintiffs must show that defendants' alleged misconduct was a substantial

---

48. The same elements of proof are required under the antitrust laws. *See Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 532 n. 26, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (stating plaintiffs must prove the existence of damages and the causal connection between defendants' wrong and plaintiffs' injury); *McCarthy v. Recordex Servs.*, 80 F.3d 842, 855 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 86, 136 L.Ed.2d 42 (1996) (finding antitrust standing principles apply equally to RICO violations).

49. Dr. Jeffrey Harris, October 22, 1998, supplemental report at 4.

factor in causing the injury to plaintiffs' business or property. *See Cox v. Administrator, U.S. Steel & Carnegie,* 17 F.3d 1386, 1399 (11th Cir.), *modified per curiam on other grounds,* 30 F.3d 1347 (11th Cir.1994), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *Mid Atlantic,* 18 F.3d at 263.[50] Plaintiffs' evidence is sufficient to meet this requirement. As Judge Motz stated in *In re American Honda Motor Co., Inc. Dealerships Rel. Litig.,* 941 F.Supp. 528 (D.Md.1996): "[i]f plaintiffs have alleged a sufficiently direct injury resulting from [defendants'] bribery scheme, they have satisfied the proximate causation requirement, difficulties of quantification and allocation notwithstanding." *Id.* at 544.

Plaintiffs' causation theory here is based upon proof of the natural and foreseeable consequences that flowed from the defendants' alleged misconduct, specifically their federal and state RICO conspiracy and scheme to defraud. If credited, the evidence before the Court shows that damage to third party medical payers was foreseeable. If credited, the evidence before the Court also shows that being required to absorb the cost of smoking-related medical treatment damaged Plaintiff Funds in their business and their property.

Plaintiffs have introduced evidence that defendants knew a direct relationship between the use of cigarette products and

health care.[51] The tobacco industry too was aware of the "double stake" that union trust funds had in paying smoking-related health care costs.[52] Plaintiffs' expert, Dr. Ronald M. Davis, testified that cigarette smoking causes lung cancer, other cancers (e.g., mouth, pharynx, larynx, esophagus, urinary bladder), heart disease, stroke, peripheral vascular disease, fetal damage and poor pregnancy outcome.[53] Davis said his conclusions about these causal relationships derive from applying the criteria for causality to the associations between smoking and disease, as described in the 1964 and 1982 Surgeon General's reports on smoking and health.[54]

Dr. Davis also testified that cigarette smoke contains more than 4,000 chemicals, including at least 43 chemicals known to cause cancer, and other dangerous substances such as carbon monoxide.[55]

Dr. Davis further says that public health efforts to reduce tobacco use during the past 35 years have had mixed successes in this country. For example, smoking rates among adults have leveled off in the past five years or so (he estimates at 25 percent), and smoking rates among youth are rising. Davis attributes these unfavorable trends "in large part" to the activities of the tobacco industry. "In the absence of those activities, tobacco use would be much lower now than it is, and hundreds of thousands of premature deaths (or more) could have been averted." The

**50.** *Similarly, an antitrust plaintiff need not show that defendants' violation is the sole cause of plaintiffs' injury; it is enough that the violation is a "material" or "substantial" cause. Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 113 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); 3 Edward J. Devitt et al., *Federal Jury Practice and Instructions* §§ 80.18, 80.19, 90.31 (4th ed.1987).

**51.** A November 15, 1968 memo to Philip Morris's president recognized the relationship between cigarette products and health care:

"Most Philip Morris products, both tobacco and non-tobacco, are directly related to the health field."
Pl.Exh. 52.

Similarly, a November 20, 1978 memo from a senior Philip Morris scientist to Philip Morris's CEO predicted that the spiraling health care costs would be attributed to smoking:

"Health care costs are rising at an alarming rate.... More industry antagonists are using an economic argument against cigarettes;—*i.e.,*

cigarettes cause disease; disease requires treatment...."
Pl.Exh. 94.

**52.** RJR's Dennis Durden, having previously been informed of an article published in *The Wall Street Journal* describing employee and union efforts to reduce health care costs, stated:

[B]usiness is indeed "ripe" for health maintenance and prevention programs—the kind that could eventually lead to anti-smoking efforts....
... I also was particularly interested in the reference of the "double stake" that unions have in reducing health care costs. This is the first time I have seen it spelled out so clearly, and it could be a harbinger of things to come.
Pl.Exh. 90.

**53.** Dr. Ronald Davis, November 6, 1998, report at 1, ¶ 1.

**54.** *Id.* at 1, ¶ 2.

**55.** *Id.* at 1, ¶ 3.

tobacco industry, in his opinion, "bears the major responsibility for the continued high prevalence of smoking" in this country.[56]

Davis also suggests the rationalization of some smokers "has been fueled by the misinformation spread by the tobacco industry and by the industry's marketing, advertising, promotions, and public relations." [57]

Plaintiffs also show evidence that, if credited, could establish the defendants suppressed product information or the development of safer cigarettes. With this evidence, plaintiffs suggest defendants were in part motivated by a concern that developing a "safer" cigarette would incriminate the "unsafe" cigarette in product liability suits.[58]

Plaintiffs contend these acts of misconduct were a substantial factor and proximate cause of the Plaintiff Funds' expenditures. Plaintiffs' damage experts have made estimates of the portion of the trust funds' overall health care costs that could be attributable to smoking.[59]

After examining the parties' evidence, the Court finds that the plaintiffs have given sufficient evidence such that a jury could find a relationship between the defendants' alleged misconduct and plaintiffs' claimed injuries. Therefore, the Court finds that the defendants' third motion for summary judgment is not well made. It is denied.

### VII. Cognizable Injury

■ In their fourth summary judgment motion, defendants claim plaintiffs have not suffered a cognizable injury. In making the claim that plaintiffs suffered no cognizable injury, defendants say that Plaintiff Funds could pass on the injuries to their business or property onto the employers.

Here, defendants argue that any higher health care cost resulting from defendants' conduct were covered by higher contribution rates that employers paid to the Funds. Defendants say that lower costs would have meant lower employer contributions with no benefit to the Plaintiff Funds. In short, defendants argue the Plaintiff Funds neither profited nor suffered from anyone's tobacco smoking.

The Court finds that defendants' argument misstates the evidence before this Court. The Plaintiff Funds are funded under collective bargaining agreements. In those agreements, employers and labor organizations agree that an employer will pay a sum certain per hour during the term of the agreement. While past costs influence the unions and employers in their bargaining over what amount will be paid for each hour of work, the sums paid are not guaranteed to cover the costs incurred by the trust fund. Increased costs stops the Plaintiff Funds from using their assets for other purposes, including the building of reserves.

In essence, defendants assert a "defensive pass-on" theory to bar plaintiffs' civil RICO claims. The Supreme Court, however, has precluded proof of a pass-on in most actions brought under § 4 of the Clayton Act. As noted above, that is the model for § 1964(c) of RICO.

---

**56.** *Id.* at 3–4, ¶¶ 12–13.

**57.** *Id.* at 5, ¶ 16.

**58.** Internal Liggett handwritten notes regarding the potential development of the safe "XA" cigarette note the concern about introducing a safer cigarette:
  A. Legal
    1. Any domestic activity will increase risk of cancer litigation on existing products
    2. Risk assessment 10–20 years after introduction
    3. Conspiracy of L & M to withhold patent
    4. Gov't concern with exclusive license to one manufacturer
Pl.Exh. 173.
  A confidential internal memo written in 1986 states:
    [I]n attempting to develop a "safe" cigarette you are, by implication in danger of being interpreted as accepting that the current product is "unsafe" and this is not a position that I think we should take.
Pl.Exh. 130. *See also* Pl.Exhs. 95–97, 100–01, 105, 107, 117, 122, 127, 136 and 169. These exhibits give evidence that the defendants understood that their alleged wrongful conduct produced "social costs" which outweighed the "benefits" to society of smoking, and that these social costs placed a financial burden upon health care payors. These exhibits also give evidence that the tobacco industry discussed a "counterattack" to investigate anti-tobacco organizations and participated in media campaigns dispel the "myth" of "social costs." *Id.*

**59.** *See* Plaintiffs' Motion to Admit Plaintiffs' Damage Model Testimony and Damage Expert Reports, filed October 13, 1998 [Docs. 295, 296].

In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Supreme Court held that a Clayton Act defendant may not defeat a direct purchaser's § 4 action by introducing evidence that the purchaser had passed on alleged illegal overcharges to its customers as higher prices.[60] In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Court held that an indirect purchaser may not maintain an action under § 4 of the Clayton Act on the theory that the direct purchaser and other intermediaries in the chain passed on the overcharges to the plaintiff.[61] In *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990), the Supreme Court repeated the reasoning followed in *Hanover Shoe* and *Illinois Brick*, holding that when a supplier violates the antitrust laws by overcharging a public utility for natural gas and the utility passes on the overcharge to its customers, only the utility has suffered antitrust injury under § 4 of the Clayton Act. *Id.* at 203–17, 110 S.Ct. 2807.

In *County of Oakland v. City of Detroit*, 866 F.2d 839 (6th Cir.1989), *cert. denied*, 497 U.S. 1003, 110 S.Ct. 3235, 111 L.Ed.2d 747 (1990), the plaintiff counties sued under RICO and the Clayton Act against the defendant city and complained of overcharges for sewage services. The plaintiffs there argued that a price-fixing conspiracy caused higher sewer charges. Upon review, the Sixth Circuit found the plaintiff counties could bring an action under RICO or the Clayton Act though they had passed on increased expenses to their customers. The Sixth Circuit

held that it would not allow the pass-on defense. *Id.* at 849–50. *See also Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467 (8th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 718 (1986); *Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985); *De Jager Constr., Inc. v. Schleininger*, 938 F.Supp. 446, 455 (W.D.Mich.1996) (rejecting defendants' " 'pass-through' argument" in construction contractor's civil RICO action arising from defendants' scheme).

Therefore, the Court denies the defendants' fourth motion for summary judgment.

## VIII. Conclusion

For the reasons herein, the Court denies the defendants' first motion. for summary judgment regarding the statutes of limitation for plaintiffs' federal RICO claim (Count I), state RICO claim (Count XIV), and civil conspiracy claim (Count XI) [Doc 272]. The Court grants defendants motion for summary judgment on statute of limitations grounds as to plaintiffs' federal and state antitrust claims (Counts IV and X) [Doc 272]. The Court denies defendants' third and fourth motions for summary judgment on causation and purported lack of cognizable injuries grounds [Doc 279, 281]. The Court grants in part the defendants' second motion for summary judgment on punitive damages under the civil conspiracy count, but rejects the defendants' arguments on striking the claim as a conspiracy to conspire [Doc 277].[62]

IT IS SO ORDERED.

## ORDER

This Court has entered it memorandum opinion in the above-captioned case. For the

---

**60.** The Supreme Court rejected the defense in *Hanover Shoe* for two reasons: First, noting that a wide range of considerations may influence a company's pricing decisions, the Court concluded that establishing the amount of an overcharge shifted to indirect purchasers "would normally prove insurmountable." 392 U.S. at 493, 88 S.Ct. 2224. The plaintiff initially would need to trace an overcharge's effects on the purchaser's prices, sales, costs and profits. Then, the plaintiff would need to show that "in the real economic world rather than an economist's hypothetical model," these variables would have behaved differently absent the alleged overcharge. *Id.* at 492–93, 88 S.Ct. 2224. Second, the Court reasoned that a pass-on defense would reduce the effectiveness of actions brought under § 4 of the

Clayton Act by diminishing the recovery available to any potential plaintiff. *Id.* at 494, 88 S.Ct. 2224.

**61.** Once again, the Supreme Court reasoned that proof of pass-on in the ordinary case would add new dimensions of complexity to already protracted actions brought under § 4 of the Clayton Act and would "seriously undermine" the private attorney general provision's deterrent effect. *Illinois Brick*, 431 U.S. at 737, 746, 97 S.Ct. 2061.

**62.** Because plaintiffs make claims against Defendants Council for Tobacco Research, The Tobacco Institute, and Hill & Knowlton only on antitrust grounds, they will be dismissed from this case. Defendant The Smokeless Tobacco Council, also excepted from Counts I and XIV, was

reasons therein, the Court denies the defendants' first motion for summary judgment regarding the statutes of limitation on plaintiffs' federal RICO claim (Count I), state RICO claim (Count XIV), and civil conspiracy claim (Count XI) [Doc. 272]. The Court grants defendants' motion for summary judgment on statute of limitations grounds as to plaintiffs' federal and state antitrust claims (Count IV and X). The Court denies defendants' third and fourth motions for summary judgment on causation and purported lack of cognizable injuries grounds [Docs. 279, 281]. The Court grants in part the defendants' second motion for summary judgment on punitive damages under the civil conspiracy count, but rejects the defendants' argument on striking the claim as a conspiracy to conspire [Doc. 277].

Furthermore, as Defendants Council for Tobacco Research, The Tobacco Institute, and Hill & Knowlton were specifically excepted from Plaintiff Funds' remaining federal and state RICO claims under Counts I and XIV of the First Amended Complaint, the Court dismisses these entities as defendants in this action.

IT IS SO ORDERED.

voluntarily dismissed as a defendant in this case    on September 8, 1998.